UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LINDA CONLIN,                              :                    CIVIL ACTION NO.
     Plaintiff,                                                   _____

VS.

CAPITAL VISION SERVICES LP,      :                    JANUARY 20, 2018
     Defendant.

## COMPLAINT

### INTRODUCTION

1.      This is an action to redress the discriminatory and unlawful treatment suffered by the Plaintiff in violation of Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq*. (hereinafter "ADEA").

### JURISDICTION

2.      Jurisdiction of this Court is invoked under the provisions of 28 U.S.C. § 1331.

3.      Plaintiff ("Mrs. Conlin") filed a charge of discrimination with the Equal Employment Opportunities Commission.  She received a Right to Sue Notice dated November 30, 2017.  This action is brought within 90 days of the receipt of such notice.

### PARTIES

4.      Mrs. Conlin is sixty-five (65) years of age and resides at 197 Fairchild Avenue, Fairfield, Connecticut, 06825.

5.      Capital Vision Service LP ("CVS"), a Delaware limited partnership, is authorized to conduct business in Connecticut.  CVS provides optometry related services across the country and is doing business as "MyEyeDr."

1

6.     CVS employs more than 20 employees.

**FACTS**

7.     In February of 2016, CVS acquired the optometry and retail parts of a business known as OptiCare Eye Health and Vision Centers ("OptiCare"); Mrs. Conlin had been employed by OptiCare for sixteen (16) years.

8.     As part of the acquisition, OptiCare District Managers including Mrs. Conlin, General Managers and support staff were assumed as employees of CVS in February 2016, without any reapplication or interview processes.  Mrs. Conlin remained employed as District Manager for for CVS in Connecticut.

9.     By the end of August 2016, Mrs. Conlin's District had the top sales in the company.

10.     In September 2016, Mrs. Conlin attended a meeting chaired by Regional Manager, Graeme Sanford (38 years of age).  Samford asked the District Managers to give the names of employees who were "at risk;" a total of 21 employees were on the list, 57% of whom were older than 50, and 71% were older than 40.  Then Sanform referring to some of the "older" employees and said, "We need to bring in younger, faster people."

11.     After the meeting, Sanford and Mrs. Conlin met privately at which time he told her that while she did well as a District Manager in August, her sales were then (only three weeks later) "slumping."

12.     Sanford said they would need to meet again in a couple weeks, at which time, she was to decide whether to step down to a lower position, the general manager position, and if that was unacceptable, Sanford said that because the company "values you as an employee," Mrs. Conlin would be "given enough time to find another job."

13.    As a result of the conversation, on September 25, 2016, Mrs. Conlin wrote a letter to Debbie Carlisle, CVS Human Resources Generalist.

14.    In the letter she described Samford's actions and words and expressed her belief that she was being discriminated against because of her age.

15.    On October 5, two former CVS District Managers were contacted by Joy Hudson of the CVS human resources department for "exit interviews" even though both had been forced to resign in August.  Independently, both gave accounts of the Sanford that were similar to Mrs. Conlin's essentially stating that they felt they were forced to leave the company.[1]

16.    On November 4, 2016, Mrs. Conlin received a call from the Vice President of Human Resources, Joseph Sherrier, at which time he told her that the investigation initiated by her letter had concluded.

17.    Sherrier told Mrs. Conlin that the company took "appropriate action" including an "additional training requirement" for Sanford.  Sherrier asked if Mrs. Conlin was satisfied with that outcome, to which she replied that she was because the behavior had ceased and that she wanted only to be evaluated by the same standards as all CVS District Managers.

---

[1] General Managers terminated by CVS since acquisition:  female, age approximately 55, and a male, age 52.  General Managers who resigned voluntarily, male, 68; and a female, approximately early 50s. A manager who voluntarily took a demotion, female, over 65.  District Managers forced to resign or take a demotion were:  Female, age 63, who took a demotion under duress, then resigned.  The District manager who replaced her is 31 years old.  Male, age 41, who resigned under duress.
    The District Manager who replaced him was age 35.  Female, age 55, who took a demotion under duress, but is still employed.  The District Manager who replaced her was age 35.  3.  Other information that may be relevant is the ages of the General Managers who came from OptiCare and are still working for MyEyeDr.
    Female, age 50; female, age 49; female, age 44; male, age 42; female, age 42; female, age 33; male, age 33; female, age 51; female, age 54; female, age 38; and female, age 53.

18. Collier then told Mrs. Conlin that at one-time Sanford had been a CVS Vice President of Operations, but that he "needed to be retooled," and was asked to step down to the District Manager position to "work his way back up."

19. Thereafter, from October through February 2017, Mrs. Conlin felt that she was being treated fairly, however, after such period, the problems resumed; Mrs. Conlin's performance was scrutinized to an intensified level and again questioned.

20. The questioning seemed puzzling since Mrs. Conlin's performance, in all crucial areas was overwhelming positive: CVS compiles what it calls a DM Power Rank ("DM"). This ranking considers sales and "Key Performance Indicators" (KPI), then it assigns a rank to each District Manager.

21. In February, Mrs. Conlin ranked first in the company in one DM category, with an overall rank of 26 out of 41. This ranking was the second highest of the four District Managers in her region. While March 2017 was more challenging due to the Norwalk office physician's medical leave, her district still managed to finish the month 36% over the "contribution" (profit) goal, the highest in the region. On March 23, at her annual performance review she was awarded a merit increase in pay.

22. March was a more difficult month since one of the doctors in her district (Norwalk office) was out for three weeks, but even with that deficit, her district finished the month 36% over the "contribution" (profit) goal, the highest in the region.

23. On March 23, 2017, Mrs. Conlin met with Sanford for her annual performance review. He scored her as needed improvement in many areas even though she was simultaneously awarded a merit increase in pay.

24.    For the month of April, Mrs. Conlin ranked 6th in the national DM Power Rank, which was first in her region; second in the company for national sales over goal (first in the region); and second in the company for national customer satisfaction (first in the region); of 6 Key Performance Indicators, she ranked first in the region in 5.

25.    Nevertheless, on April 14, 2017, Sanford and Carlisle called Mrs. Conlin and read the Performance Improvement Plan to her.  Sanford gave her assignments and reports to prepare for weekly conference calls with human resources on Friday afternoons.

26.    She completed all assignments and reports on time.  Some of the reports were redundant because Sanford already had the information, but she sent them anyway.  During the weekly calls, which were led by Sanford, she reviewed the previous week's agenda, the agenda for the coming week and the reports, although it was clear Sanford had not read the reports she sent.

27.    One of Mrs. Conlin's weekly assignments was to meet with the District Manager, Jonathan Pearce, who had taken over the Norwalk office, to discuss his evaluation of the office and learn how he was making improvements.  At the first meeting, Pearce acknowledged that better staffing and training was needed, which was what Mrs. Conlin had previously reported to Sanford in March.

28.    In subsequent meetings, Mrs. Conlin told Pearce that she had repeatedly asked for help in Norwalk, but never received any.  Pearce responded that she was "a nice person" and needed to inform Sanford that the office would fail if she did not get help.  But Sanford knew of the problems in that office well before.

29.    On the May 19, 2017, weekly call with Sanford, he was audibly yawning while she reviewed the reports; she found this humiliating.

30. On May 24, Mrs. Conlin met with Sanford in person while Carlisle was on the phone. Sanford said that she had not demonstrated leadership to company standards over the performance improvement period. The issue of leadership in the Performance Improvement Plan referred to the Norwalk office only, which she was no longer responsible for.

31. Sanford repeated, essentially, the same that he had stated in September 2016, namely, she could either "step-down" to be the General Manager (instead of District manage) or resign.

32. The "step-down" position was a demotion and was not made in good faith. CVS agents knew that Mrs. Conlin would refuse what would essentially be a 20% pay cut, $5000 in lost benefits, and a 45 mile commute each way to a struggling office doomed for failure. Additionally, the stepdown position would necessitate the discharge of the then manager pg such office, a person which Mrs. Conlin herself trained; they knew this would be morally unacceptable to her.

33. On Friday, May 26, Mrs. Conlin called Sanford and verified that she was given no choice but to resign.

34. Mrs. Conlin's position was recently filled with an employee much younger than Mrs. Conlin.

35. Mrs. Conlin contends that Sanford's actions were a continuation of the discriminatory conduct of September 2016 and also retribution for my reporting of such issues in September.

36. She contends that that the Performance Improvement Plan was enacted only to create a paper trail to help create a pretext for her constructive discharge.

37. The pretext is illustrated by the flip-flopping by CVS pertaining to Mrs. Conlin's separation from CVS; it's agents first argued that the reason for her separation was her

performance, then on the two (2) appeals of her application for unemployment compensation they argued that she was asked to "step-down" because of intentional misconduct.

38.    Both or either of these reasons, in turn, also demonstrate the lack of good faith basis of the "step-down" offer described above; why offer a poorly performing employee who allegedly committed intentional misconduct *any* new position?

**FIRST COUNT**: Direct Discrimination

38.    Paragraphs 1-38 are hereby incorporated by reference and made part of this First Count.

39.    During all times relevant to this complaint, Sanford and Carlisle were agents of CVS and acting within the scope of their respective employment and agency powers.

40.    During all times relevant to this complaint, Mrs. Conlin was a member of a protected class and qualified for her position.

41.    During all times relevant to this complaint, the quality of Mrs. Conlin's performance excelled most of her younger colleagues nationally and regionally.

42.    During all times relevant to this complaint, Sanford made the hostile comments set forth above regarding "older" employees and constructively discharged Mrs. Conlin to replace her with a significantly younger person as Director.

43.    Accordingly, CVS violated the ADEA with intentional, knowing and/or reckless disregard of that Act's proscriptions.

**SECOND COUNT**: Retaliation

44.    Paragraphs 1-43 are hereby incorporated by reference and made part of this Second Count.

45.    Mrs. Conlin's May 2017 constructive discharge was in retaliation for her September 25, 2016, letter to Debbie Carlisle, CVS Human Resources Generalist, regarding age discrimination.

46.    Accordingly, CVS violated the ADEA with intentional, knowing and/or reckless disregard of that Act's proscriptions.

WHEREFORE, Plaintiff claims judgment against the Defendant as follows:

1.      Back pay and front pay in an amount to be determined by the trier of fact with interest from the date said sum was due;

2.      Compensatory damages in an amount to be determined by the trier of fact;

3.      Punitive damages in an amount to be determined by the trier of fact;

4.      An injunction permanently enjoining Defendants, its officers, agents, employees, successors, assigns and all persons in active concert of participation with them from engaging in any employment practice which discriminates on the basis of age;

5.      Attorney's fees and costs of this action; and

6.      Such further relief as this Court deems necessary and proper.

THE PLAINTIFF


By_____/s/_____
        Riccardo L. Pate, Esq.
        155 Post Road East
        Westport, CT 06880
        (203) 226-9922
        Federal Bar No.  ct 15057

9

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LINDA CONLIN,                          :              CIVIL ACTION NO.
    Plaintiff,                                                  _____

VS.

CAPITAL VISION SERVICES LP,      :              JANUARY 20, 2018
    Defendant.

## **REQUEST FOR TRIAL BY JURY**

Plaintiff hereby requests trial by jury in the above captioned matter.

THE PLAINTIFF

By_____/s/_____
    Riccardo L. Pate, Esq.
    155 Post Road East
    Westport, CT 06880
    (203) 226-9922
    Federal Bar No.  ct 15057